Filed 4/4/14

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D063847 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. CD2438884) |
| KATHY J. ROWE, | |
| Defendant and Respondent. | |

APPEAL from orders of the Superior Court of San Diego County, Runston G. Maino and Joan P. Weber, Judges. Reversed.

Bonnie M. Dumanis, District Attorney, Laura E. Tanney, Chief Deputy District Attorney, Gary W. Schons and Martin E. Doyle, Deputy District Attorneys, for Plaintiff and Appellant.

Law Office of Charles Sevilla and Charles M. Sevilla for the Defendant and Respondent.

INTRODUCTION

In this case, we must decide whether a magistrate erred in determining a defendant should not have to answer charges of soliciting forcible rape and forcible sodomy after the defendant advertised online for sexual partners for an unwitting victim and then, while impersonating the victim, invited men who responded to the advertisement to appear at the victim's home unannounced to engage in "freak show" sexual activity. We conclude the magistrate indeed erred and, therefore, reverse the superior court's order denying the People's motion to reinstate the charges.

BACKGROUND

*Preliminary Hearing Evidence*

The People filed an amended felony complaint against Kathy J. Rowe alleging, among other charges, one count of solicitation to commit forcible sodomy and one count of solicitation to commit forcible rape (Pen. Code, § 653f, subd. (c)).[1] At a preliminary hearing on the charges, the prosecutor presented evidence showing Rowe, impersonating the victim, posted an online advertisement, entitled, "Carmel Valley Freak Show," offering adult entertainment of all types while the victim's husband was not at home.[2]

*Solicitation to Commit Forcible Sodomy Count*

G.M. responded to the posting. In his response, which included a nude frontal photograph of himself, he stated, "Hey Im 25 and new to SD and I am looking for fun!

---

[1] Further statutory references are also to the Penal Code unless otherwise stated.

[2] Rowe continued to impersonate the victim in all subsequent exchanges described.

2

Im tall, attractive, fun, D&D free and I aim to please!  I promise Im a nice guy and not a weirdo or pervert (at least not the bad kind).  I want to spoil a lucky lady with massages, making out, lots of oral, and some great sex!  I got a nice tool, and I can use it very well! I love giving and receiving oral and long sex session trying out all sorts of positions.  I also have some 420 if your into that.  Here's a pic.  I can host.  Let me know if your interested in getting together sometime."[3]

Rowe replied, "Just stop by any Monday-Friday 9am-3pm."  G.M. responded, "What's the address, do you have any pics and a description of yourself?"  Rowe sent him a photograph of the victim obtained from a social media website and replied, "What do you think of my photo?"

G.M. responded, "Nice, so you just like guys to stop by for fun?  How do I know if I show up its going to be you there?  What are you into, what gets you off?"  Rowe replied, "I'm pretty much home all day every day, bored and incredibly horny.  I love to be surprised and have a man just show up at the door and force his way in the door and on me, totally taking me while I say no.  Anal sex makes me come incredibly hard.  Do you like anal?  What are you into?  I'm getting wet just thinking about this.  What is your name.?"

G.M. responded, "I'm [G].  Sounds good.  I just moved to SD and looking for fun. I have not had to[o] much experience with anal, my previous gf's weren't into it.  Im into it, and Im interested in making you cum hard with anal sex, I've never seen a girl do that.

---

[3]     Spelling and grammar errors in this and other quotations appeared in source documents.

3

Im into everything except male male stuff and stuff with my butt. My favorite is 69 where I lay on my back and you can squat me and I eat you while you suck me. I also like to go multiple rounds. Do you have any more pics? Can I see that nice runners body?" Rowe never replied to him.

*Solicitation to Commit Forcible Rape Count*

Approximately two weeks after G.M.'s response, J.M. responded to the same or similar post.[4] In his response, J.M. indicated he was a 28-year old single guy looking for "a one night stand or if all is good ongoing, but for now just need to get laid." He described his height and build and listed his phone number.

Rowe received J.M.'s response and told him to stop by the victim's home "any Monday-Friday, 9am-3pm. I like the element of surprise." He replied asking for the location and Rowe sent him the victim's address.

Approximately two weeks later, J.M. sent an e-mail asking if the victim was still available. Rowe replied, "absolutely." The next day, Rowe sent another reply stating, "I'm available all week. Maybe we can have a nooner on your lunch hour? I will have my pussy clean shaven every day awaiting your tongue. Just stop on by and surprise me with your hard-on."

A few days later, J.M. went to the victim's home and no one was there. He explained at the preliminary hearing, "There was a gate before the actual front door. I

---

[4]    There was evidence Rowe posted the advertisement in multiple places multiple times.

4

went to the gate. It was locked, so I was unable to knock on the door." He sent Rowe an e-mail stating he could not knock on the door or use the doorbell and did not know whether anyone was home. Rowe replied, "I'm SO sorry, want to make it up to you. Will make it extra wild and worth your time."

J.M. went back to the victim's home a little later in the day and the victim's husband was there. J.M. sent an e-mail to Rowe stating "I went back a little later and a guy was there, had to make up an excuse for why I was there." Rowe replied, "I hope it's okay with you that I see other guys." J.M. responded, "It's fine with me, but I mean he answered the door, he lived there."

The next day, Rowe replied, "Once in awhile my husband drops by during the day to see if he can catch me in the act. He knows about my men, that I have to get fucked at least once a day, sometimes more, and he just can't do that anymore. Don't worry, he won't intrude on us unless we want him to . . . if we want him to join us, he will. Are you into threesomes? He will do my ass if you to stay in my pussy. It makes my pussy even tighter, you'll enjoy it. But it's totally up to you. Or you can switch and do my ass too. Do you like anal sex?" J.M. responded, "I would love to do your ass, but I would prefer if he didn't drop by."

The same day, Rowe replied, "Have you had much experience with anal sex? Do you enjoy it?" J.M. responded, "A few times successfully, most of the times the girl wouldn't let me get it in more than a bit before pushing me off cuz it hurt. Yes I enjoy it. Do you have a picture?" Rowe never replied to him.

A few months later, J.M. attempted to let Rowe know he was still available by sending a message stating, "Haven't heard back from you."  The record does not show Rowe replied to the message.

*Other Harassment*

Rowe's advertisement was part of an ongoing campaign of harassment apparently undertaken to retaliate against the victim and the victim's husband for being the successful bidders on a home Rowe also wanted to buy.  The harassment included Rowe: (1) listing the victim's home for sale; (2) putting a hold on the victim's and the victim's husband's mail; (3) having over a $1,000 worth of unsolicited magazines, books, and junk mail sent to the victim's home; (4) sending Valentine's Day cards from the victim's husband to the wives of the victim's neighbors; (5) having a county assessor's office employee contact the victim and the victim's husband about reassessing their home; (6) having members of religious groups visit the victim's home; (7) posting an online announcement for a high school New Year's Eve party at the victim's home; and (8) posting an online announcement for a free Mexican fireworks giveaway at the victim's home on Independence Day.[5]

---

5    All of these acts except the posting of the advertisement for free fireworks preceded the posting of the Carmel Valley Freak Show advertisement.  At the time of the acts, the victim and the victim's husband lived in the home with their two children, one of whom was born shortly after they moved in.

When law enforcement officers traced the acts to Rowe and interviewed her, she initially denied committing them. She later admitted committing the acts, referred to them as "pranks," and denied any intent to harm the victim or the victim's husband.

*Dismissal of Charges*

At the conclusion of the preliminary hearing, the magistrate dismissed both solicitation charges under section 871, stating he did not have a strong suspicion Rowe had the specific intent to cause the two men to commit any kind of sexual assault.[6] Specifically, the court stated, "As to Count 1 [forcible rape], I just don't find that I have a strong suspicion there was specific intent to cause that person that went over, which was [G.M.], to commit any kind of a rape. And I think I can consider the entire picture not only Count 1 but Count 2 and everything else to figure that out.

"I think the specific intent has to be with the defendant not with the—[G.M.]. Clearly, I don't think he had the specific intent to commit that crime. There's not much doubt in my mind about that just seeing him and seeing how he testifies. . . . .

"As to Count 2 [forcible sodomy], there is some language there that would involve force, the 'Enter even though I say no. Go ahead.' But I don't think that based on

---

6     Section 871 provides: "If, after hearing the proofs, it appears either that no public offense has been committed or that there is not sufficient cause to believe the defendant guilty of a public offense, the magistrate shall order the complaint dismissed and the defendant to be discharged, by an indorsement on the depositions and statement, signed by the magistrate, to the following effect: 'There being no sufficient cause to believe the within named A. B. guilty of the offense within mentioned, I order that the complaint be dismissed and that he or she shall be discharged.' "

7

everything I've heard that that was the specific intent was in the defendant to cause someone to do that. And I just—I don't have a strong suspicion."

*Reinstatement Motion*

The prosecutor subsequently moved to compel reinstatement of the felony complaint under section 871.5.[7] Rowe argued the court could not grant the motion because the magistrate had made a factual finding Rowe did not have the requisite specific intent. The court disagreed the magistrate had actually made factual findings. Nonetheless, the court denied the motion and affirmed the magistrate's decision, finding the charged crimes were a legal impossibility because Rowe invited the men to engage in and the men believed they would be engaging in consensual sexual activity.

## DISCUSSION

### I

*Standard of Review*

"In reviewing the court's denial of the prosecution's section 871.5 motion to reinstate the charge, we disregard the ruling on the motion and directly examine the

---

[7] Section 871.5 provides in part: "(a) When an action is dismissed by a magistrate pursuant to Section . . . , 871, . . . of this code . . . , the prosecutor may make a motion in the superior court within 15 days to compel the magistrate to reinstate the complaint or a portion thereof and to reinstate the custodial status of the defendant under the same terms and conditions as when the defendant last appeared before the magistrate. [¶] (b) Notice of the motion shall be made to the defendant and the magistrate. The only ground for the motion shall be that, as a matter of law, the magistrate erroneously dismissed the action or a portion thereof. [¶] (c) The superior court shall hear and determine the motion on the basis of the record of the proceedings before the magistrate. If the motion is litigated to decision by the prosecutor, the prosecution is prohibited from refiling the dismissed action, or portion thereof."

magistrate's decision to dismiss at the preliminary hearing. [Citation.] We review the magistrate's legal conclusions de novo, but are bound by any factual findings the magistrate made if they are supported by substantial evidence. If the magistrate makes no controlling findings of fact, we review the record independently. If, in carrying out an independent review, we determine that the evidence supplied a rational ground for holding the defendant to answer, we must reinstate the charge." (*People v. Plumlee* (2008) 166 Cal.App.4th 935, 938-939; *People v. Dawson* (2009) 172 Cal.App.4th 1073, 1087-1088, 1091.)

Preliminarily, the parties dispute whether the magistrate made a factual finding or reached a legal conclusion Rowe lacked the requisite specific intent for the charges against her. As this dispute affects our standard of review, we address it briefly.

In the context of dismissal of charges at a preliminary hearing, a court makes a factual finding when, after resolving evidentiary disputes and/or assessing witnesses' credibility, it determines there is no evidentiary support for one or more elements of a charge. Conversely, a court makes a legal conclusion when it accepts the prosecution's evidence, but determines there is insufficient evidentiary support for one or more elements of a charge. (See *People v. Superior Court (Henderson)* (1986) 178 Cal.App.3d 516, 521, disapproved on another point in *People v. Beltran* (2013) 56 Cal.4th 935, 952, fn. 10; *People v. Superior Court (Day)* (1985) 174 Cal.App.3d 1008, 1015.)

In this case, the evidence before the magistrate was essentially undisputed. It consisted of e-mail exchanges between Rowe and the two men, the testimony of the two men authenticating and corroborating the e-mail exchanges, the testimony of the victim

9

and her husband confirming they never authorized Rowe's actions, and the testimony of a law enforcement officer indicating Rowe initially denied her actions, then later admitted them, but described them as "pranks" not intended to hurt anyone. The record does not show the magistrate disbelieved or disregarded any of this evidence. The record also does not show the magistrate determined there was *no evidentiary support* for a finding Rowe possessed the requisite criminal intent. Rather, the record shows the magistrate accepted the proffered evidence, but determined, there was *insufficient evidentiary support* for a finding Rowe possessed the requisite criminal intent. Accordingly, the magistrate's determination was a legal conclusion, not a factual finding, and we review the determination de novo. (See *Pizano v. Superior Court of Tulare County* (1978) 21 Cal.3d 128, 133 [a magistrate does not make factual findings, but instead reaches a legal conclusion when the magistrate accepts the evidence and simply determines it does not provide probable cause to believe the offense was committed]; *People v. Bautista* (2014) 223 Cal.App.4th 1096, 1101-1102 [a magistrate's finding there is insufficient evidence to support a charge is not binding on a reviewing court and a reviewing court independently reviews the evidence to determine its sufficiency]; *People v. Dawson* (2009) 172 Cal.App.4th 1073, 1089 [a magistrate has not made factual findings where the magistrate's ruling does not contain an express statement of what the magistrate "found" nor any indication of what evidence the magistrate believed or disbelieved]; *People v. Campbell* (2002) 82 Cal.App.4th 71, 76-77 [where the facts are undisputed and the sole question before the magistrate is whether the undisputed facts support the charges, the question before the magistrate is one of law, not fact].)

10

Although the dissent disagrees with our conclusion, the dissent does not identify a specific flaw in our legal analysis. The dissent also does not cite any authority supporting a contrary conclusion.

II

*Sufficiency of Evidence for Holding Rowe to Answer Solicitation Charges*

"Every person who, with the intent that the crime be committed, solicits another to commit rape by force or violence [or] sodomy by force or violence . . . shall be punished by imprisonment in the state prison . . . ." (§ 653f, subd. (c).) The offense requires (1) a request to another person to commit a specified crime, which was (2) made with the intent the crime be committed, and (3) received by the person to whom it was made. (§ 653f, subd. (c); *People v. Saephanh* (2000) 80 Cal.App.4th 451, 458; *Laurel v. Superior Court of Los Angeles County* (1967) 255 Cal.App.2d 292, 298; CALCRIM No. 441.) The parties do not dispute the evidence presented at the preliminary hearing supplied a rational ground for believing G.M. and J.M. received Rowe's posting and reply messages. Rather, they dispute whether the evidence supplied a rational ground for believing the posting and reply messages constituted requests to G.M. and J.M. to commit forcible sodomy and forcible rape, respectively. They also dispute whether the evidence supplied a rational ground for believing Rowe acted intending the crimes of forcible rape and sodomy be committed.

## A

### *Request to Commit Crime*

Whether the evidence supplied a rational ground for believing Rowe requested J.M. and G.M. to commit forcible rape and sodomy turns on whether the men had to perceive her request as such.  We conclude they did not.  Rather, we conclude it is sufficient Rowe requested they perform acts, which would have amounted to forcible rape or sodomy if committed.

We reach this conclusion because the crime of solicitation focuses on the intention and action of the solicitor, not the solicitee.  The crime "is complete once the verbal request is made with the requisite criminal intent; the harm is in asking, and it is punishable irrespective of the reaction of the person solicited."  (*In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1377-1378; accord, *People v. Wilson* (2005) 36 Cal.4th 309, 328; see also *People v. Bell* (1988) 201 Cal.App.3d 1396, 1399 [it is irrelevant that the person solicited did not actually intend to aid and abet the solicitor]; *People v. Cook* (1984) 151 Cal.App.3d 1142, 1145 [same].)  In addition, allowing a person to be held to answer for solicitation charges under the circumstances presented serves section 653f's "twofold purpose of protecting the inhabitants of California from being exposed to inducement to commit or join in the commission of crimes and preventing solicitations from resulting in the commission of the crimes solicited."  (*People v. Saephanh*, *supra*, 80 Cal.App.4th at p. 459, citing *Benson v. Superior Court* (1962) 57 Cal.2d 240, 243; *People v. Burt* (1955) 45 Cal.2d 311, 314.)

Although J.M. and G.M. were innocent agents and requesting an innocent agent to commit a crime does not constitute a solicitation under the Model Penal Code (Model Pen. Code & Commentaries, com. to § 5.01, pp. 346-347), California did not derive section 653f from the Model Penal Code.  (*People v. Saephanh*, *supra*, 80 Cal.App.4th at p. 457.)  Moreover, under some of the more modern statutes, it is typically "no defense to a prosecution for solicitation that the solicitee is criminally irresponsible or immune to prosecution; *is unaware of the criminal nature of the conduct solicited or of the defendant's criminal purpose*; or is for some other reason incapable of entertaining the mental state required for the commission of the offense solicited."  (4 Wharton's Criminal Law (15th ed. 2013) § 675, fns. omitted and italics added; LaFave, Substantive Criminal Law (2d ed. 2013) §11.1, fn. 112 and statutes cited therein.)  California criminal law is consistent with these modern statutes because, under section 31, a person's use of an innocent agent does not absolve the person of criminal culpability.  (§ 31, *People v. McCoy* (2001) 25 Cal.4th 1111, 1120-1121; *People v. Thomas* (2007) 146 Cal.App.4th 1278, 1292, disapproved on another point in *People v. Shockley* (2013) 58 Cal.4th 400, 405-406; *People v. Simon* (1995) 9 Cal.4th 493, 522, fn. 19.)  Thus, Rowe's use of innocent agents does not preclude her from being charged with solicitation.

B

*Intent for Crime to Occur*

The requisite intent for solicitation can be inferred from the circumstances of the asking.  (*People v. Miley* (1984) 158 Cal.App.3d 25, 34; *People v. Gordon* (1975) 47 Cal.App.3d 465, 472, disapproved on another point in *Stark v. Superior Court* (2011) 52

13

Cal.4th 368, 407, fn. 15.)  Here, the evidence shows Rowe's online advertisement was part of an ongoing, escalating campaign to retaliate against the victim.[8]  The advertisement described the available sexual activity as a "freak show," which was "[n]ot for the faint of heart."  The victim did not know of or authorize the advertisement.  When G.M. and J.M. responded to the advertisement, Rowe encouraged them to visit the victim's home unannounced during the day with the promise they would be able to engage in sexual activity consistent with the advertisement.  Moreover, Rowe strongly implied G.M. should not take "no" for an answer, and she pressed J.M. to continue trying to contact the victim even after he made two failed attempts to do so.  Consequently, there is a rational ground for believing Rowe intended for J.M. and G.M. to engage in forcible sexual activity with the victim against the victim's will.

The dissent disagrees with our conclusion.  To the extent the dissent's disagreement focuses on whether Rowe intended for any sexual activity to occur, the requisite strong suspicion is supplied by evidence Rowe placed more than one online advertisement, attempted over several weeks to send more than one man to the victim's home, and attempted over several days to send one particular man to the victim's home multiple times.

---

8    Rowe disputes this point because the posting for free fireworks occurred after the posting for the Carmel Valley Freak Show.  However, at the very least, her acts of harassment were escalating to the point of the Carmel Valley Freak Show posting.  In addition, we can reasonably infer from the record the two postings overlapped to some degree and the free fireworks posting was not aimed at attracting only harmless, law-abiding citizens to the victim's home.

To the extent the dissent's disagreement focuses on whether Rowe intended for any sexual activity to be nonconsensual, the requisite strong suspicion is supplied by the victim's testimony she did not authorize anyone to advertise for and arrange sexual liaisons on her behalf. It is also supplied by the absence of any evidence from which to infer Rowe knew the victim, knew the victim's sexual preferences, or reasonably believed the victim would condone someone impersonating her and inviting strangers to her home unannounced to engage in "freak show" sexual activity.

Finally, to the extent the dissent's disagreement focuses on whether Rowe intended for any sexual activity to be "forcible," the dissent misapprehends this element of the charges. "Force" for purposes of forcible rape or sodomy is the degree of physical force sufficient to support a finding the sexual activity was against the victim's will. (*People v. Griffin* (2004) 33 Cal.4th 1015, 1023-1024; *People v. Hale* (2012) 204 Cal.App.4th 961, 978.) It need not be substantially different or substantially greater than the force inherent in consensual sexual activity. (*People v. Griffin*, at p. 1023.) Moreover, " ' " '[*t*]*he kind of physical force is immaterial*; . . . it may consist in the taking of indecent liberties with a woman, or laying hold of and kissing her against her will.' " ' " (*Id.* at p. 1024.) The ultimate question is whether the force accomplished the sexual activity against the victim's will, not whether the force overcame the victim's physical strength or ability to resist. (*Id.* at p. 1028.)

Here, the requisite strong suspicion Rowe intended any sexual activity to be forcible is supplied by evidence Rowe encouraged the men to surprise the victim, led them to believe the victim would be prepared to engage in "freak show" sexual activity

15

with them immediately upon their arrival, and led them to believe the victim would be pleased if they were in the same state. At the least, this evidence creates a reasonable inference Rowe intended the men to take indecent liberties with, lay hold of, or kiss the victim against her will when they made contact with the victim. This inference is bolstered by Rowe's indication to one of the men the victim liked to feign resistance to heighten her sexual experience. Considered collectively, the evidence presented at the preliminary hearing provided a rational ground for believing Rowe intended for sexual activity to occur, intended for it to be nonconsensual, and intended for it to be forcible. Accordingly, the magistrate erred in declining to hold Rowe to answer the solicitation charges.[9]

## DISPOSITION

The superior court's order denying the People's motion to reinstate the complaint is reversed. The superior court is directed to enter a new order granting the motion and directing the magistrate to reinstate the complaint.

McCONNELL, P. J.

I CONCUR:

HALLER, J.

---

[9]    Nothing in our decision is intended to express any opinion about whether a trier of fact could or would find Rowe guilty of the charged crimes beyond a reasonable doubt.

16

McDONALD, J., Dissenting.

In my opinion the magistrate correctly determined the defendant should not have to answer charges of soliciting forcible rape and forcible sodomy. I would therefore affirm the superior court's order denying the People's motion to reinstate the charges.

I agree with the majority opinion that the legal conclusions of the magistrate are reviewed de novo but the magistrate's findings of fact are binding on this court if supported by substantial evidence. I also agree with the majority opinion that the Penal Code section 653f, subdivision (c), crime with which the defendant was charged in counts 1 and 2 requires the defendant to have solicited another person to commit the crimes of forcible rape and forcible sodomy with the intent the crimes be committed.

I disagree with the majority opinion's observations the magistrate did not make a factual finding that the defendant did not make the solicitations with the intent the crimes of forcible rape and forcible sodomy be committed by the recipient and, if our review is de novo, that the evidence at the preliminary hearing supplied a rational basis for believing the solicitations were to commit forcible rape and forcible sodomy.

At the conclusion of the preliminary hearing, the magistrate first considered count 1, the charge of solicitation of forcible rape in defendant's communications with J.M. The magistrate concluded "[a]s to Count 1, I just don't find that I have a strong suspicion there was specific intent to cause . . . [J.M.] to commit any kind of a rape." The magistrate then considered count 2, the charge of solicitation of forcible sodomy in defendant's communications with G.M. The magistrate concluded "[a]s to Count 2, there is some language . . . that would involve force, the 'Enter even though I say no. Go

ahead.'  But I don't think that based on everything I've heard that that was the specific intent . . . in the defendant to cause someone to do that."  Furthermore, the magistrate concluded that both J.M. and G.M. considered defendant's solicitations to be for voluntary, not forcible, sex.  The magistrate then ruled that "I'm not binding over on Count[s] 1 and 2."

In my view, the statements of the magistrate in support of not binding over for trial counts 1 and 2 constitute findings of fact that the defendant did not have the intent that the persons who received the communications commit the crimes of forcible rape or forcible sodomy.  If those findings were supported by substantial evidence the superior court's order denying the People's motion to reinstate the charges was legally compelled and correct, and should be affirmed.

A review of the transcript of the preliminary hearing confirms there is substantial evidence to support the no criminal intent finding of the magistrate.  That review establishes that of the numerous solicitations made by the defendant to G.M. or J.M. all were for voluntary, consensual sex, none were for forcible sex.  The only arguable variation on the solicitation for voluntary sex were statements defendant commented to J.M. that in the context of a meeting for consensual sex, J.M. could pick a time to surprise her, force the door and appreciate it if she said "no": In this context, these comments suggesting force could not be considered other than attributes of consensual sex that would make consensual sex more exciting.

Even were our standard of review de novo, as the majority opinion strongly asserts, a review of the preliminary hearing record does not contain a rational ground for

2

believing the defendant's communications to J.M. and G.M. constituted solicitations to commit forcible rape and forcible sodomy.  In my view, regardless of the appropriate standard of review, the order of the superior court denying the People's motion to reinstate the charges against defendant should be affirmed.


McDONALD, J.